Andrew P. Marks (AM-0361)
LITTLER MENDELSON, P.C.
885 Third Avenue
New York, New York 10022-4834
(212) 583-9600

Attorneys for Plaintiff
Fidelity National Information Services, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FIDELITY NATIONAL INFORMATION SERVICES, INC.,

    Plaintiff,

-against-

SETH N. ROTHMAN,

    Defendant.

Case No.

**<u>VERIFIED COMPLAINT</u>**

---

Fidelity National Information Services, Inc., by its attorneys, Littler Mendelson, P.C., for its complaint against Seth Rothman, alleges:

### The Parties

1. Plaintiff Fidelity National Information Services, Inc. ("ACBS" or the "Company") is an Arkansas corporation with its principal place of business in Jacksonville, Florida. The Company is registered to do business in the State of New York.

2. Defendant Seth N. Rothman ("Rothman") is an individual residing in the State of New York. Until recently, Rothman was employed by ACBS as its Director of Product Management, and worked in its New York City office.

## Jurisdiction and Venue

3. Pursuant to 28 U.S.C. §1332, this Court has jurisdiction over this action because the matter in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of costs and interests, and there is complete diversity of citizenship between the parties.

4. Pursuant to 28 U.S.C. §1391(a)(2), venue properly lies in this Court because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

## Factual Allegations

5. ACBS is the comprehensive commercial lending, trading and loan trade settlement division of Fidelity National Information Services, Inc.. It provides major banks and lending institutions with an end-to-end workflow and information management process in connection with the origination and trading of syndicated loans.

6. ACBS's suite of products integrates front-office origination, syndication, deal structuring, documentation, credit approval, portfolio monitoring and trading with back-office servicing and accounting processes.

7. One of the unique competitive advantages to ACBS's product suite is integration among the multiple products used by constituents (both within and among institutions) in the loan syndication industry.

8. This product integration is exactly this significant competitive advantage that ACBS's competitors have wished to replicate in their own products but, to date, have not been successful.

9.  As customer relations manager for our products, Rothman was privy to client feedback regarding their usage and preferences.

10. Such feedback and client information is useful to enhancing and refining ACBS's products.

11. The operational details and computer processes of ACBS products constitute confidential and proprietary business information and a valuable asset of ACBS.

12. SyndTrak is an integral and essential product in ACBS's product suite. SyndTrak is a software application that facilitates powerful data sharing among bankers, traders and salespeople within loan syndication and trading firms.

13. SyndTrak is unique in the market as it has an intuitive user interface that is uniquely targeted to the loan syndication and trading marketplace, and thus provides firm-wide contact management, investor appetite management and deal book-running in one package.

14. SyndTrak is the market leader with fifty-two (52) clients globally.

15. In fact, SyndTrak is the only commercially available application in production that has been specifically tailored to the unique requirements of bankers, traders and sales people in the syndicated loan market space.

16. SyndTrak also integrates with popular desktop software programs, like Microsoft Outlook®, Word®, and Excel® as well as many popular fax servers and PDAs.

17. SyndTrak's features, along with the single information source used by all its components, speed the process, reduce errors and eliminate redundant effort.

18. SyndTrak is also integrated with ACBS's online document distribution application, SyndTrak Online.

19. This integration provides unique functionality to the market in that via a single interface both document distribution and syndication management can be undertaken.

20. From May 18, 1998 to July 24, 2007, Rothman was employed by ACBS or its predecessor Customized Database Systems, Inc., which was acquired by ACBS in or about December 2003.

21. Rothman was Director of Product Management for ACBS's front-office products.

22. In this position, Rothman was responsible for product strategy, management, and implementation; customer service; and account relationship management for these products, including SyndTrak, SyndTrak Online, LoanTrak, and ClearPar.

23. Rothman was the key architect and product manager for both SyndTrak and SyndTrak Online and was the primary developer of SyndTrak. He has been integral in the entire design, development and requirements gathering process for these products. As such, he has attained specific and unique product knowledge while employed by ACBS.

24. In light of his unique accomplishments, intimate access to confidential information about SyndTrak and its other front-office products, and interactions with clients who use ACBS's products, ACBS generously compensated Rothman, and Rothman agreed to protect ACBS's confidential information.

25. On October 4, 2002, Rothman executed a Confidentiality, Work Product and Non-Competition Agreement (the "Agreement"). A true and accurate copy of the Agreement is attached hereto as <u>Exhibit A</u>.

26. By signing the Confidentiality, Work Product, and Non-Competition Agreement in 2002, Rothman acknowledged he would have access to trade secrets and confidential or proprietary information of the Company's that were not generally known to the public or in the information technology industry. Such trade secrets and confidential or proprietary information includes, without limitation, (a) with respect to the Company, any source code to proprietary software systems, product plans, marketing plans, pricing information, client lists, prospects, business plans, forecasts, strategies, and terms of Client contracts; and (b) with respect to Clients, any Client financial or customer information (collectively, "Confidential Information").

27. In Paragraph 1 of the Agreement, Rothman agreed that both during and after his employment with the Company, he would not (a) use the Company's Confidential Information other than in connection with the performance of his duties as an employee of the Company, or (b) disclose the Company's Confidential information unless (i) such disclosure was required by law, (ii) disclosure was to other personnel of the Company utilizing it in the course of their performance of services for the Company, or (iii) pursuant to the written consent of the Company.

28. Rothman also agreed in Paragraph 4 of the Agreement, that upon the earlier of his termination of employment with the Company for any reason, or the request of the Company, he shall return to the Company all equipment, documents, records, notes, program designs, reports, letters, memoranda, notes, other writings, proposals and

Client lists in whatever form, and all photocopies or electronic forms or representations thereof, or other material in his possession or control that (i) may contain or be derived from Confidential Information or (ii) are connected with or derived from his services to the Company.

29. In Paragraph 8 of the Agreement, Rothman agreed that he would not, for a period of one year after the termination of his employment with the Company, solicit employment with, nor accept an offer of employment from, *any company that offers products or services that compete directly with those offered by the Company*.

30. In Paragraph 9 of the Agreement, Rothman agreed and acknowledged that his breach or threatened breach of the Agreement would cause irreparable harm to the Company and agreed that the Company shall be entitled to all remedies available at law or in equity with respect to such breach or threatened breach of the Agreement by him. Rothman further agreed in Paragraph 10, that in the event that he breached or threatened to breach any of the provisions of the Agreement, the Company—in addition to and not in limitation of any other rights, remedies, or damages available to the Company in law or equity—shall be entitled to a permanent injunction in order to prevent or restrain any such breach by him.

31. Rothman agreed in Paragraphs 2 and 9 that the provisions of the Agreement would be binding on him both during and after his employment by the Company.

32. On July 24, 2007, Rothman resigned from his employment with ACBS and promptly thereafter began working for IntraLinks, Inc. ("IntraLinks").

33. IntraLinks is a direct competitor of ACBS's SyndTrak Online product.

34. IntraLinks has announced its intentions to become a competitor of SyndTrak for major commercial and investment banks.

35. At present, IntraLinks' does not have a sales and syndication product that competes with SyndTrak.

36. Currently, IntraLinks' only product is virtual document hosting and sharing.

37. Earlier this year, IntraLinks' announced its intention to develop a "fully integrated front office deal and investor relationship management system," and, therefore, to compete with SyndTrak.

38. On information and belief, Rothman has been hired by IntraLinks to materially help design, develop and manage its new product in competition with ACBS's SyndTrak product.

39. When integrated with their existing product, the combined solution will directly compete with ACBS's integrated SyndTrak and SyndTrak Online products.

40. Rothman is employed as IntraLinks' Product Line Manager for this new product. In this role, he will be marketing a product competitive with SyndTrak to the syndicated loan and settlement market.

41. In fact, Rothman has scheduled a meeting with ACBS's client at Wachovia, in Charlotte, North Carolina.

42. Rothman met this client as a result of his employment with ACBS.

43. Wachovia is not listed on IntraLinks' web site among its clients.

44. ACBS's client at Wachovia works in the syndicated loan area; Rothman would have no reason to travel to meet with her to discuss any type of non-competitive product or service.

45. Given Rothman's intricate knowledge of ACBS's confidential information, including but not limited to its design, development, customer base, customers' satisfaction and dissatisfactions, it is inevitable that Rothman will use or disclose confidential information to the unfair advantage of IntraLinks and in breach of the Agreement.

46. Rothman frequently performed services for ACBS from his home using a personal computer connected to ACBS office system.

47. Rothman's personal computer, which remains in his possession, contains readily retrievable confidential and proprietary information, documents, and property of ACBS.

48. The unique and intimate knowledge Rothman obtained while working for ACBS, including computer source codes (*i.e.*, programming language listings of the instructions to the computer), client relationships and preferences, as well as other trade secrets and confidential and proprietary information still in his possession, will provide IntraLinks with a significant and unfair competitive advantage by allowing it to duplicate ACBS's product without expending the time and money needed to develop the product independently.

49. On August 22, 2007, ACBS, through its attorneys, sent a letter to Rothman demanding that he return all confidential and proprietary information and other property

of the Company, cease working for IntraLinks, and otherwise adhere to the provisions of his Agreement with ACBS.

50.     On August 30, 2007, Rothman and IntraLinks' attorney communicated to ACBS that Rothman intends to continue his relationship with IntraLinks.

51.     It is apparent under the circumstances that Rothman, with the support and encouragement of IntraLinks, has violated and is continuing to violate his Agreement with ACBS.

### FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

52.     ACBS repeats and realleges each and every allegation set forth in paragraphs 1 through 51 as if fully set forth herein.

53.     By his Agreement with ACBS, Rothman agreed that he would not, for a period of one year after the termination of his employment with the Company, solicit employment with, nor accept an offer of employment from, any company that offers products or services that compete directly with those offered by the Company.

54.     By his aforesaid actions, Rothman has breached his Agreement with ACBS.

55.     As a result of the aforesaid actions by Rothman, ACBS has suffered and will continue to suffer immediate and irreparable harm to its business and goodwill.

56.     Money damages are inadequate to fully compensate ACBS for the incalculable loss of its competitive edge, good will, client, customer, business, and employee relationships, and future profits that are impossible to determine, that result from Rothman's continued wrongful acts.

57. ACBS is therefore entitled to a temporary, preliminary, and permanent injunction: (i) prohibiting Rothman from using and disclosing ACBS's Confidential Information as defined in the Agreement; (ii) directing Rothman to immediately return to ACBS all of its confidential documents, materials, and other property; (iii) directing Rothman to surrender to ACBS's forensic computer expert any personal computer(s) and/or laptop(s) on or with which he performed ACBS work or which may contain Confidential Information, Work Product, or other material derived from the Confidential Information of the Company; and (v) prohibiting Rothman from soliciting or accepting, or retaining employment with any company, including IntraLinks, Inc., that offers services or products that compete directly with those offered by ACBS until July 24, 2008.

## SECOND CAUSE OF ACTION
### (Unfair Competition)

58. ACBS repeats and realleges each and every allegation set forth in paragraphs 1 through 57 hereof as if fully set forth herein.

59. Upon information and belief, Rothman has engaged in unfair competition by, among other things, unlawfully using or disclosing ACBS's Confidential Information to assist ACBS's direct competitor to develop or improve another competitive product and market it to ACBS clients. Such disclosure breaches his Agreement with ACBS.

60. Given Rothman's intricate knowledge of ACBS's products, including, but not limited to SyndTrak, he would inevitably disclose ACBS's Confidential Information during his employment with IntraLinks and his involvement with IntraLinks' efforts to develop a product to compete with ACBS's.

61.   As a result of the aforesaid actions by Rothman, ACBS has suffered and will continue to suffer immediate and irreparable harm to its business and goodwill.

62.   Money damages are inadequate to fully compensate ACBS for the incalculable loss of its competitive edge, good will, customer, business and employee relationships, and an amount of future profits that are impossible to determine, that result from Rothman's continued wrongful acts.

63.   ACBS is therefore entitled to a temporary, preliminary, and permanent injunction: (i) prohibiting Rothman from using and disclosing ACBS's Confidential Information as defined in the Agreement; (ii) directing Rothman to immediately return to ACBS all of its confidential documents, materials, and other property; (iii) directing Rothman to surrender to ACBS's forensic computer expert any personal computer(s) and/or laptop(s) on or with which he performed ACBS work or which may contain Confidential Information, Work Product, or other material derived from the Confidential Information of the Company; and (v) prohibiting Rothman from soliciting or accepting, or retaining employment with any company, including IntraLinks, Inc., that offers services or products that compete directly with those offered by ACBS until July 24, 2008.

### THIRD CAUSE OF ACTION
### (Misappropriation)

64.   ACBS repeats and realleges each and every allegation set forth in paragraphs 1 through 63 hereof as if fully set forth herein.

65.   Upon information and belief, Rothman intentionally and wrongfully misappropriated ACBS's property. This property is ACBS's Confidential Information, which, as defined by the Agreement is trade secrets and confidential or proprietary

11

information consisting of knowledge or information not generally known to the public or in the information technology industry, and includes, without limitation, with respect to the Company, any source code to proprietary software systems, product plans, marketing plans, pricing information, client lists, prospects, business plans, forecasts, strategies, and terms of Client contracts; and (b) with respect to Clients, any Client financial or customer information.

66. Rothman has failed to return this property to ACBS, despite his obligations under the Agreement and ACBS's demands to do so.

67. As a result of the aforesaid actions by Rothman, ACBS has suffered and will continue to suffer immediate and irreparable harm to its business and goodwill.

68. Money damages would be inadequate to fully compensate ACBS for the incalculable loss of its competitive edge, good will, customer, client, business, and employee relationships, and an amount of future profits that are impossible to determine, that would result from Rothman's continued wrongful acts.

69. ACBS is therefore entitled to a temporary, preliminary, and permanent injunction: (i) prohibiting Rothman from using and disclosing ACBS's Confidential Information as defined in the Agreement; (ii) directing Rothman to immediately return to ACBS all of its confidential documents, materials, and other property; (iii) directing Rothman to surrender to ACBS's forensic computer expert any personal computer(s) and/or laptop(s) on or with which he performed ACBS work or which may contain Confidential Information, Work Product, or other material derived from the Confidential Information of the Company; and (v) prohibiting Rothman from soliciting or accepting, or retaining employment with any company, including IntraLinks, Inc., that offers

services or products that compete directly with those offered by ACBS until July 24, 2008.

### REMEDY SOUGHT

70. **WHEREFORE**, ACBS respectfully requests that judgment be made and entered against Defendant Rothman and in favor of ACBS, as follows:

    (a)    On the FIRST CAUSE OF ACTION granting Plaintiff the injunctive relief sought therein.

    (b)    On the SECOND CAUSE OF ACTION granting Plaintiff the injunctive relief sought therein.

    (c)    On the THIRD CAUSE OF ACTION granting Plaintiff the injunctive relief sought therein.

    (e)    AS TO ALL CAUSES OF ACTION:

        (1)    enjoining Defendant from using or disclosing ACBS's Confidential Information as defined in the Confidentiality, Work Product and Non-Competition Agreement, dated October 4, 2002;

        (2)    directing Rothman to immediately return to ACBS all of its confidential documents, materials, and other property

        (3)    directing Rothman to surrender to ACBS's forensic computer expert any personal computer(s) and/or laptop(s) on or with which he performed ACBS work or which may contain Confidential Information;

        (4)    enjoining Defendant from soliciting or accepting employment with any company, including IntraLinks Inc., that offers products or services that compete directly with those offered by ACBS for the period ending July 24, 2008;

    (f)    AS TO ALL CAUSES OF ACTION awarding Plaintiff its costs and disbursements incurred herein, including its attorneys' fees incurred in prosecuting this action; and

    (g)    Granting Plaintiff such other and further relief as the Court may deem just, equitable, and proper.

Dated: New York, New York
      August 31, 2007

                          LITTLER MENDELSON, P.C.

                          _____
                          Andrew P. Marks (AM-0361)
                          885 Third Avenue
                          New York, New York 10022-4834
                          (212) 583-9600

                          Attorneys for Plaintiff
                          Fidelity National Information Services, Inc.

## VERIFICATION

STATE OF NEW YORK     )
                     ) ss.:
COUNTY OF NEW YORK    )

    RICHARD LEVY, being duly sworn and deposed, states:

    1.    I am the President of ACBS Loan Systems, the comprehensive commercial lending, trading and loan trade settlement division of the Plaintiff in this matter.

    2.    The foregoing complaint is true to the best of my knowledge, except as to those matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

                                                    RICHARD LEVY

Sworn to before me on this
30 day of August, 2007.

_____
Notary Public

ANDREW P. MARKS
Notary Public, State of New York
No: 4963847
Qualified in Westchester County
Commission Expires March 19, ____

Exhibit A

Case 1:07-cv-07756-JGK    Document 1    Filed 08/31/2007    Page 16 of 19

## CONFIDENTIALITY, WORK PRODUCT AND NON-COMPETITION AGREEMENT

As an employee of Customized Database Systems, Inc. (the "Company"), I acknowledge that I have had or will have access to trade secrets and confidential or proprietary information of the Company that are owned by the Company and/or are used in the operation of the Company's business or affairs. I acknowledge that I also have had or will have access to trade secrets and confidential or proprietary information of the Company's clients or prospective clients (collectively "Clients"). Such trade secrets and confidential or proprietary information consist of knowledge or information not generally known to the public or in the information technology industry and shall include, without limitation (a) with respect to the Company, any source code to proprietary software systems, product plans, marketing plans, pricing information, client lists, prospects, business plans, forecasts, strategies, and terms of Client contracts; and (b) with respect to Clients, any Client financial or customer information (collectively, "Confidential Information").

Therefore, in consideration of my employment by the Company, I hereby agree as follows:

1. Both during and after my employment by the Company, I will not: (a) use any Confidential Information other than in connection with the performance by me of my duties as an employee of the Company; or (b) disclose any Confidential Information to any other person or entity (collectively, any 'Person"), except (i) as required by law, (ii) to personnel of the Company utilizing such Confidential Information in the course of their performance of services for the Company, or (iii) with the prior written consent of the Company.

2. Both during and after my employment by the Company, I will respect and adhere to all non-disclosure, confidentiality or similar agreements to which the Company is, or during the period of my employment by the Company becomes, a party or subject.

3. I hereby assign to the Company all of my right, title and interest in and to, and agree to disclose promptly to the Company, any and all work product, inventions, discoveries, copyrights, programs, and works of authorship developed, discovered, improved, authored, derived, invented or acquired by me during the period of my employment by the Company that are either related to the scope of my employment by the Company or make use, in any manner, of the resources of the Company (collectively, "Work Product"). I agree that all Work Product is and shall remain the exclusive property of the Company, and to the extent not already owned by the Company, I hereby assign to the Company all of my right, title, and interest in and to all Work Product without further compensation. It is understood that the term Work Product includes, but is not limited to, all work product developed, discovered, improved, authored, derived, invented or acquired by me that: (a) incorporates or reflects any Confidential Information: (b) is to any extent developed utilizing any computer equipment or software of or licensed to the Company or any supplies, equipment or facilities of or provided by the Company; or (c) results from any work performed by me for the Company, unless the Company and I agree in writing that such work product does not constitute Work Product.

4. Upon the earlier of the termination of my employment with the Company for any reason, or the request of the Company, I shall return to the Company all equipment, documents, records, notes, program designs, reports, letters, memoranda, notes, other writings, proposals and

    Client lists in whatever form, and all photocopies or electronic forms or representations thereof, or other material in my possession or control that (i) may contain or be derived from Confidential Information or (ii) are connected with or derived from my services to the Company.

5. I hereby further agree not to disclose to the Company, and not to induce the Company to utilize, any proprietary information or trade secrets of any other party that are in my possession, unless and to the extent that I have authority to do so.

6. I acknowledge that the Company shall have the right to disclose the obligations imposed upon me by this Agreement to my future or prospective customers, clients, or employers.

7. I shall not, for a period of one year after the termination of my employment with the Company, solicit employment with, nor accept an offer of employment from, any Client or prospective Client to the extent that:

    a. I was introduced to such Client or prospective Client in connection with my employment at CDS; OR

    b. my duties as an employee of such Client or prospective Client would be similar to those that CDS performs for Clients including, without limitation, providing software or consulting to Client operations in loan or bond origination, syndication or trading.

8. I shall not, for a period of one year after the termination of my employment with the Company, solicit employment with, nor accept an offer of employment from, any company that offers products or services that compete directly with those offered by the Company.

9. I understand that the Company has expended considerable resources in developing the Confidential Information and that it is unique and valuable to the Company's business; that it provides a competitive advantage to the Company; and that it is not publicly known. I understand and agree that a breach or threatened breach by me of this agreement would cause irreparable harm to the Company and agree that the Company shall be entitled to all remedies available at law or in equity with respect thereto. I understand that this agreement shall be binding on me both during and after my employment by the Company and upon my heirs, successors and personal representatives, and that this entire agreement shall inure to the benefit of the Company and its successor and assigns.

10. In the event that I breach or threaten to breach any of the provisions of this agreement, I agree that the Company -- in addition to and not in limitation of any other rights, remedies, or damages available to the Company in law or in equity -- shall be entitled to a permanent injunction in order to prevent or restrain any such breach by me or my partners, agents, assigns, representatives, employees and/or any and all persons directly or indirectly acting for me.

11. I acknowledge this agreement to be the sole agreement between me and the Company concerning its subject matter and that with respect to its subject matter it supersedes entirely all prior agreements, understandings and correspondence, including those contained in any offer of employment to me by the Company or any contract or agreement entered into between

the Company and me prior to the date hereof

12. This agreement shall be governed by and construed in accordance with the laws of the State of New York.

13. In the event that any provision of this agreement is held unenforceable or invalid by any court of competent jurisdiction, I agree that the enforceability and validity of the remainder of this agreement shall be unaffected thereby.

_____
Seth N. Rothman

10/4/02
_____
Date